**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHELE GATES** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 21-1081** |
| | : | |
| **ARAMARK CAMPUS, LLC** | : | |

---

**McHUGH, J.**                                                              **January 24, 2022**

## <u>MEMORANDUM</u>

This is an action alleging sex discrimination, retaliation, and a hostile work environment brought by a woman who worked for Aramark for 27 years before she was fired in 2017.  As the District Controller for Aramark, Plaintiff was assigned a contract with the Philadelphia Phillies.  She alleges that Aramark gave in to pressure from the Philadelphia Phillies and terminated her on the basis of her sex.  With discovery complete, Aramark seeks summary judgment.

A reasonable jury could find that Plaintiff was terminated because of sex discrimination.  But Plaintiff's remaining claims lack sufficient support in the record. As to retaliation, the only evidence Plaintiff can point to is that is that she and her supervisor discussed her potentially discriminatory treatment.  As to the hostile work environment claim, the conduct complained of cannot be deemed so pervasive or severe as to alter the conditions of her employment.  Therefore, Defendant's motion will be granted in part and denied in part.

I.       <u>Factual and Procedural Background</u>

Michele Gates brings claims for sex discrimination, retaliation and hostile work environment under Title VII, 42 U.S.C. §2000e-2(a).  Plaintiff also asserts claims under the Pennsylvania Human Relations Act (PHRA), 43 PA. STAT. §§ 951 *et seq*. and the Philadelphia

Fair Practices Ordinance (PFPO), Phila. Code §9-110 I *et seq.* Under Title VII, PHRA, PFPO. Compl. ¶8, ECF 1.

Defendant Aramark Campus LLC is a multi-national food services and facility provider. Compl. ¶2. Plaintiff worked for Aramark Campus LLC from September 1990 until her termination in October 2017. Gates Dep. 31:23-32:5; Compl. ¶2. This case arises out of an eighteen-month period leading up to her termination, during which she served as a District Controller based at Citizens Bank Park ("CBP") and prepared financial reports for the Philadelphia Phillies ("Phillies"). Compl. ¶¶18, 22. In this position, she reported to Kevin Tedesco, Aramark's General Manager for the Citizens Bank Park account, Tedesco Dep. 39:6-9, Brian Hastings, District Manager for the Philadelphia District of Aramark's line of business, Hastings Dep. 23:1-3, and Doug Dunn, Regional Finance Director for the East Region of Aramark's Line, Dunn Dep. 7:19-22, and interacted with Kirk McCready, Aramark Controller for CBP, McCready Dep. 7:19-20, Ryan Coleman, Aramark Controller for the Wells Fargo Center, Coleman Dep. 5:19-20, and Erica Silvi, the Senior Human Resources Manager for Aramark, Silvi Dep. 12:5-8. Compl. ¶¶20, 21, 38, 40, 46. Her primary contact at the Philadelphia Phillies was Phillies' employee Michael Carson, whose title was Controller. Gates Dep. 89:13-23.

Ms. Gates was hired for the position of District Controller for the Philadelphia District on March 31, 2016. Mr. Hastings, Mr. Dunn, and Mr. Tedesco made the decision to hire Ms. Gates, with approval by the Philadelphia Phillies (the "Phillies"). Gates Dep. 71:11-23, 73:24-74:5, 86:2-4, 86:12-15, Hastings Dep. 78:11-79:13. Before this position, Ms. Gates had worked as a multi-unit controller for Aramark at its Villanova University Conference Center, where she managed budget development, cost control, profit margin, record keeping, and forecasting, along with accounting and audit procedures. *See* Gates Resume, Pl.'s Ex. 8, Gates Dep. 67:18-68:24. As

District Controller for a variety of clients including the Phillies, her job responsibilities included overseeing financial and cash operations, preparing financial reports, and presenting financial information to the client and management teams for various locations and businesses within the Philadelphia district.[1]  Gates Dep. 97:21-100:17.  Although similar to her prior position as a multi-unit controller, her role as a District Controller was much more challenging because it involved overseeing a larger number of locations, a higher dollar volume, and preparing complicated reports based on more complex contracts.[2]  *See* Job Description, Pl.'s Ex. 10*; 75:11-77:5, 82:21-24; Silvi Dep. 160:3-7.

Of the eleven highest ranking employees of Aramark based at CBP, ten of them were men, and only one of them, Ms. Gates, was a woman.  Hastings Dep 27:15-28:10; Silvi Dep. 178:22-179:1.  And only two of the eight highest level employees within Aramark's Philadelphia district were women.  Hastings Dep at 26:5-16.[3]  According to Plaintiff, the work environment at CBP was "predominantly male-oriented" and functioned as a "boys' club."  Gates Dep. 233:13-24.  Aramark's office suite at CBP was referred to as—and featured a placard with the words— "[t]he Frat House," which was ultimately removed, but remained up during Ms. Gates' tenure.  Hastings Dep. 9:10-12:9.  According to Mr. Hastings, the "Frat House" placard connotated "a loose...party-

---

[1] Ms. Gates was responsible for a number of locations within the Philadelphia district including CBP, Lincoln Financial Field, Wells Fargo Center, the University of Pennsylvania Athletics Department, Pennsylvania Convention Center, Arts Quest, Turtleback Zoo, Cape May Zoo, and special events at other locations. Gates Dep. 75:19-77:5.

[2] Mr. Hastings noted, "You know, we knew when we hired her it was a position she was really going to have to grow into and kind of, you know, get a better understanding of --- once again, it was a very complex contract, and the district had a number of complex contracts too."  Hastings Dep. 83:16-23.

[3] When discussing the leadership at Aramark, Mr. Tedesco stated, "[i]f you look at the top row, it was definitely more male. Support roles, there was definitely females in support roles. If you did the math, it was predominantly male [individuals in the position of manager level employees of Aramark at CBP]." Tedesco Dep. 82:22-83:1.

type atmosphere" which he admitted "sent the wrong message" to clients and employees.  *Id.*
11:18-12:1.

Ms. Gates felt alienated by her colleagues, describing the office culture as one that "wasn't
inclusive," and recalling that "[n]o one would come in and talk to [her] and include [her] in
conversations."  Gates Dep. 253:14-17.  As the "only female on the team," Ms. Gates "walked to
the Phillies' boardroom [by herself]" while "all the men walked together in their own huddle."  *Id.*
253:14-23.  Although Ms. Gates admits that no one said anything to indicate that they were
excluding her because she was a woman, as opposed to because she was a new employee, she felt
excluded *because of* her sex.  *Id.* 254:18-255:5.

Throughout her tenure as District Controller, Ms. Gates recalls that male employees
sometimes made disrespectful or sexual comments about women or displayed inappropriate
behavior.  For instance, at an NFL Draft event in Summer 2017, male General Managers watched
"two very attractive looking women walk[] by [and] [e]veryone turned and stared, Brent Hardin's
mouth opened, his eyes widened, he walked over to them to see if they were lost, when clearly he
just wanted to have an interaction with these two attractive women," which, according to Ms.
Gates, was not uncommon behavior.  *Id.* 252:3-16.  Ms. Gates recalls two male Aramark
employees who stared at her chest, and "would not even look me in the eyes or face." *Id.* 341:13-
22.[4]

Other employees corroborate Ms. Gates' account that male employees made inappropriate
comments.  For instance, Mr. Hastings admits that during his tenure at CBP, he has heard men

---

[4] During her deposition, Ms. Gates reported that an employee named Ed stared at her chest.
When asked how many times he stared at her chest, she reported, "I don't remember the exact
number of times. One time was too many." She also reported that another employee, Bobby,
stared at her chest on "[m]ore than one occasion." Gates Dep. 341:13- 343:1.

make derogatory comments about women's appearances and tell dirty or sexual jokes.  Hastings Dep. 115:10-118:13.  However, he reports that he did not hear these comments or jokes frequently, noting that "in this day and age, and it's been quite a while, there is more of an understanding than when I came through the business [that] certain things are inappropriate and what takes place, you know, in a place of business." *Id*. at 115:18-116:9.  Although he is "pretty sure [women] would be offended" by the types of comments he has heard, he has not "direct[ly] reprimand[ed] the employees, but has "indicated [to the employees that such behavior is] inappropriate." *Id.* 117:20-23.

In March 2017, the Phillies, and specifically Michael Carson, the Controller for the Phillies, requested that Ryan Coleman, the Aramark Controller for the Wells Fargo Center, assist Ms. Gates with her job responsibilities for the Phillies contract.  Hastings Dep. 41:15-43:13.  Mr. Coleman had formerly held the position of Assistant Unit Controller for the CBP account and had familiarity with the job responsibilities. Coleman Dep. 5:19-10:24, 22:6-23:24, 24:20-27:2, 28:4-31:20, 36:14-19, 56:4-20. According to Mr. Hastings, Carson wanted Coleman to assist Ms. Gates because he was "unhappy with the information he was getting,... he didn't feel that...Michele had a good understanding of where the information was coming from" and given Mr. Coleman's prior experience with the Phillies contract, if he "collaborated with Michele...the information would be more accurate." Hastings Dep. 42:19-43:6.[5]  When Mr. Coleman was assigned to assist Ms. Gates, Ms. Gates' pay, title and other terms and conditions of employment did not change.  Gates Dep. 296:19-297:6.

---

[5] During his deposition, Mr. Coleman testified that Mike Carson indicated to him that he was upset with Ms. Gates' performance and wanted him to assist Ms. Gates because "the numbers [were]n't right." Coleman Dep. 47:6-16.

Ms. Gates alleges that even after she began working with Mr. Coleman, Mr. Carson remained skeptical about her performance and treated her differently than Mr. Coleman. For example, she testified that Mr. Carson sent a volley of emails regarding a particular project and posed questions to both Plaintiff and Mr. Coleman. "When I would give an answer, it was not accepted. He accepted Ryan's answers, not mine." *Id.* 237:5-14.

Ms. Gates attributes Mr. Carson's treatment of her to his dislike of working with women. According to Ms. Gates, other employees corroborated their beliefs that Mr. Carson, and the Phillies more generally, disfavored working with women.[6] Ms. Gates testified that on or around May 15 or 17, 2017, Mr. Hastings told Plaintiff that the Phillies were unhappy with her performance, and then remarked "maybe he [Carson] doesn't like women." Gates Dep. 119:15-19; 235:16-18. Mr. Hastings denies ever making such a comment. Hastings Dep. 47:12-21. During that same meeting, Plaintiff complained to Mr. Hastings that "her actions with the Phillies were humiliating and demoralizing, and that no matter what she did she was criticized." Pl's Compl. ¶29. "Well, he just asked how I was holding up. You know, he said, you know, I can't imagine—I can only imagine what you are going through, or no, I really can't." Gates Dep. 236:2-6. Ms. Gates also alleges that during a second meeting with Mr. Hastings on May 30, 2017, she reported that she was concerned that she was being discriminated against by the Phillies because she was a woman, which Mr. Hastings also disputes. Compl. ¶¶31-32, Hastings Dep. 53:19-54-

---

[6] In support of this, Ms. Gates alleges that in October 2017, Aramark employee Kirk McCready remarked "I don't think Mike likes working with women." Gates Dep. 260:14-16. Ms. Gates also alleges that while Ryan Coleman was assisting Ms. Gates, he remarked, "why am I even here...you got this...you know what you are doing" and then commented that Mr. Carson "must not like women." Gates Dep. 258:1-11. Ms. Gates also testified, "All I know is from Brian saying that maybe Mike doesn't like women, doesn't like working with women, and I also had on other occasions Ryan and Kirk both commenting, I don't think Mike likes working with women, what did you do to piss him off, he must not like women." Gates Dep. 237:21-238:4.

10. According to Ms. Gates, Mr. Hastings then said, "maybe they don't like women, maybe the Phillies don't like women, you heard what happened to Chrissy Flanigan, right?"  Gates Dep. 239:23-240:3.

Mr. Hastings denies asking this question, but does not deny that Ms. Flanigan, the first and only Aramark female employee to hold the position of General Manager at Citizens Bank Park, was transferred out of her position at the Phillies request, and replaced by male employee Kevin Tedesco.  Hastings Dep. 55:10-22, 23:20-23, 60:4-8, 98:22-99:2. (Q: And Aramark accommodated the Phillies' request to remove Chrissy Flanigan from the GM role, correct? A: Correct." *Id.* 98:22-99:2.).

In May 2017, Mr. Hastings, in consultation with Mr. Dunn, Regional Finance Director for the East Region, and Erica Silvi, the Senior Human Resources Manager at Aramark with responsibility for the Philadelphia District, placed Ms. Gates on a 60-day performance review plan ("PIP") that began on May 31, 2017, to address what they described as job performance issues. Ms. Gates alleges that Mr. Hastings informed her that she was receiving the PIP because "the Phillies were very unhappy with [her], and things had escalated very quickly, and they needed to do something."  Gates Dep. 119:13-18.  The PIP's listed areas of deficient performance were 1) Time Management, 2) Accuracy in Reporting, 3) Communication & Leadership, and 4) Client Expectations.  Performance Improvement Plan, Pl's Ex. 11; Dunn Dep. 37:1-23, 39:4-13, 41:13-44:7, 44:22-45:5, 45:11-47:17, 48:15-49:15, 50:5-52:17; Hastings Dep. 90:18-22, 93:18-94:20, 96:10-97:3, 99:13-24, 136:15-137:21, 139:21-143:13; Silvi Dep. 87:3-88:25, 89:23-90:6, 91:12-19; 92:2-4, 109:4-12, 123:5-21; Gates Dep. 117:24-118:23.

At the time that Ms. Gates was placed on the PIP, her supervisor and other employees had not previously communicated to her in writing about any purported performance deficiencies.

Gates Dep. 335:18-336:3.   Ms. Gates alleges that Mr. Tedesco, her direct supervisor, never criticized her performance, either verbally or over email.   *Id.* 335:18-336:20.   Mr. Hastings is unable to point to any document during Ms. Gates' first year in the position in which he informed staff that he found her performance to be deficient, and prior to 2017, he did not communicate with anyone from HR or the Employment Relations Unit regarding concerns about Ms. Gates' performance. Hastings Dep. 88:6-21; 118:19-119:2.[7] Although Defendant employees did not communicate to Ms. Gates that her performance was deficient in advance of placing her on a PIP, the record contains one email in which Mr. Coleman communicated with Ms. Gates about an error that she made.  Email, Def's Ex.  8.

Ms. Gates' fellow employees testified that Ms. Gates made errors with respect to the timeliness of her financial reporting, accuracy in her calculations and reports, and proactive communication about discrepancies in the financial reports to senior management and clients. Tedesco Dep at 12:10-17, 23:11-24:13.  And Ms. Gates herself admits that she made mistakes on the job.  (So do you agree that there had been reports that you submitted with inaccurate information that you had put into those reports?" "Yes, I agree that there were some reports that I submitted that had errors that were some of my errors." Gates Dep. 125:5-11.)

Although Ms. Gates worked on a team that shared responsibility for quality control of reports, during her tenure as District Controller, she was the only employee whose work was critiqued by the Phillies.  Hastings Dep. 33:6-12; Tedesco Dep. 120:20-23.  Aramark explains this disparate treatment by alleging that Plaintiff had the ultimate responsibility for ensuring that

---

[7] Although Kevin Tedesco agreed with the decision to terminate Ms. Gates' employment, he does not recall anything in writing documenting concerns about her performance. Tedesco Dep. 23:11-24:24. Human Resources Manager Ms. Silvi was also unable to identify any document showing that Ms. Gates was informed of deficiencies or mistakes prior to the PIP. Silvi Dep. 99:1-12.

information was collected and accurate, with reports generated in a timely fashion and submitted to management and clients. Dunn Dep. 59:8-10; Hastings Dep. 83:5-9. Aramark further emphasizes Gates' obligation to understand the information in the reports so she could answer questions and proactively communicate anomalies or discrepancies. Dunn Dep. at 50:14-51:13, 59:8-10, 72:5-21; Hastings Dep. at 113:13-19, 134:21- 135:2, 172:17-18, 173:8-10, 190:22-192:1; McCready Dep. at 48:11-20; Silvi Dep. at 122:7-22; Tedesco Dep. at 142:16-17, 143:14-21. Plaintiff rejects this as an oversimplification, contending that other team members were jointly responsible for review. *See* Gates Dep. 181:21-24. As to that point, Aramark employee Doug Dunn confirms that both Tedesco and Hastings were responsible for reviewing Ms. Gates' calculations. Dunn Dep. 59:58:21-59:24.

After placing Ms. Gates on a PIP, Mr. Hastings informed Mr. Carson that he had done so. Although Mr. Hastings disputes the allegation that the PIP was instigated by the Phillies, and that the Phillies wanted Ms. Gates to be placed on a PIP, Hastings Dep. 93:21-24, 100:2-12, he informed only the Phillies of that action, and not any of her other many clients. *Id.* 133:5-12. This was the first time in Mr. Hasting's memory that he told any client or a representative of a client that an Aramark employee had been placed on an internal PIP. *Id.* 102:4-14. He maintains that he shared this information with the Phillies because he "wanted to keep them informed of the processes we were taking to, you know, correct what they viewed as, you know, [Ms. Gates'] shortcomings" and notes that the contract with the Phillies was "a very collaborative contract." *Id.* 100:2-20; 102:102:4-21. Ms. Gates responds that the Phillies' sex bias – and their outsized revenue stream for Aramark – is the reason she was placed on the PIP in the first place.[8] ("Is it fair to say

---

[8] According to Mr. Hastings, in the period during which Ms. Gates worked at CBP, the Phillies generated the most revenue for Defendant of the numerous properties within Mr. Hastings District, which according to Ms. Silvi is around $40 to $50 million per year. Hastings Dep. 72:4-11; Silvi Dep. 62:13-20.

as a general matter that Aramark doesn't want to lose the Phillies as a client?" "Yes that's very true." Hastings 75:22-76:1.)

Ms. Gates successfully completed the PIP.  Hastings Dep. at 194: 2-8, Silvi Dep. at 129:4-12.  The only notes regarding Ms. Gates's performance throughout the duration of the PIP are contained on a single piece of handwritten paper.  On the June 7 entry, Mr. Hastings wrote "no issues" with respect to the categories of "client expectations," and "communication and leadership."  In his notes from June 14th, Mr. Hastings wrote that there were no issues with the respect to "time management," "accuracy in reporting," and "communication and leadership."  In this entry, notes include that "Mike Carson remains apprehensive about the information being provided by Michele," but the notes do not specify why Mr. Carson was apprehensive.  Hastings Dep. 150:1-151:24.  In or around July 2017, approximately three months before Ms. Gates' termination, Mr. Carson left his employment with the Phillies.  Gates Dep. at 79:2-18.

According to Aramark, following the completion of Ms. Gates's PIP, they continued to notice performance errors.  For instance, Mr. Dunn testified that he felt as though Ms. Gates failed to take initiative to set up calls with him following the PIP.  Dunn Dep. 72:5-75:22.  Mr. Hastings testified about concerns with a report regarding commissions for CBP.  As to that criticism, Ms. Gates testified that she and her colleagues, not just her, had checked the numbers together, and that the software was not functioning correctly. Gates Dep. 181:8-24, Hastings Dep. 169:17-173:12.  Defendant includes in the record two emails, one in which Brent Hardin, Aramark's Regional Vice President for the East Region, notes that numbers related to CBP are "off somewhere," to which Mr. Tedesco replies that "we will [] bridge together for your review," Def's Ex. 9, and an email between Aramark employees in which Mr. Dunn reported that he was "just

about at the Carson point with [Gates], that I can't trust anything she sends me to be correct."
Def's Ex. 11.

On October 13, 2017, Aramark terminated Ms. Gates' employment, which coincided with the end of the 2017 baseball season.  Hastings Dep. 194:15-20, October 13 Calendar Invite, Pl's Ex. 17.  Aramark replaced Ms. Gates in the District Controller position with a male external hire named Leo Arcilla.  Tedesco Dep. 77:8-14.  For the Phillies at Citizens Bank Park, another male Aramark employee, Mr. McCready took over Ms. Gates' job duties.  Hastings Dep. 34:21-24.

## I.      Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## II.     Discussion

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's sex."  42 U.S.C. §2000e-2(a)(1).  In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to claims brought under Title VII, the PHRA, and the PFPO.  *See McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted) (applying the same framework to claims brought under Title VII and the PHRA); *Vandergrift v. City of Phila.*, 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017) (quoting *Fagleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d. Cir. 2002)) (analyzing claims under the PFPO under the same framework as Title VII and PHRA claims).

Under the controlling test, to establish a *prima facie* case of termination based on sex discrimination, a plaintiff must show that (1) she belongs to a protected class, (2) she is qualified

for the position, (3) she is subject to an adverse employment action, and (4) the circumstances support an inference of discrimination. *McDonnell Douglas Corp,* 411 U.S. at 802-03; *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802. At this time, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer is able to satisfy his burden of production, the presumption of discriminatory action raised by the *prima facie* case is rebutted and the burden shifts back to the plaintiff to establish that the employer's legitimate, non-discriminatory reason was merely pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. At the summary judgment stage, the plaintiff can establish pretext by showing some evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons. *Joyce Milillo v. Thomas Jefferson U. Hosp., Inc.*, No. 14-3143, 2015 WL 5964992, *5 (E.D. Pa. Oct. 13, 2015) (citations omitted).

1. **Summary Judgment is Denied with Respect to Ms. Gates' Claim of Sex Discrimination**

*a. The Prima Facie Case*

Given that Ms. Gates is a member of a protected class (female) and was qualified for the position, the question is whether the circumstances surrounding the adverse employment action (termination) support an inference of discrimination. "[T]he elements of a *prima facie* case depend on the facts of the particular case." *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 411 (3d Cir. 1999). Courts have consistently emphasized that the fourth prong (inference of discrimination) should not be applied mechanically or rigidly because the plaintiff's burden at this stage "is not

onerous." *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981); *Scheidemantle v. Slippery Rock. Univ.,* 470 F.3d 535, 539 *(3d Cir. 2006); Ezold v. Wolf Block*, 983 F.2d 509, 523 (3d Cir. 1993) ("Because the *prima facie* case is easily made out, it is rarely the focus of the ultimate disagreement.").  The plaintiff must simply provide enough facts to allow a jury to infer that her termination raised an inference of discrimination.

Here, Ms. Gates asserts a broad range of potentially discriminatory conduct:  that as the only female employee on her team, her performance was critiqued while fellow male employees' performance was not;[9] that the only client that complained about Ms. Gates was the Phillies, Hastings Dep. 132:19-133:4, 136:6-14; Dunn Dep. 31:24-32-17; that Mr. Carson of the Phillies treated her dismissively compared to Mr. Coleman; that she was placed on a Performance Improvement Plan without having received prior written feedback about her performance; that Aramark employees also suggested that the Phillies might have a gender-based bias against women; and that she successfully completed the PIP, but her employment was nonetheless terminated at the end of the 2017 baseball season.

Given that a Plaintiff may establish a causal connection between her protected status and an adverse employment action through both direct and circumstantial evidence, it is also proper to consider the surrounding circumstances at Aramark, including that Ms. Gates was the only high-level female employee on the Aramark team at Citizens Bank Park, the former General Manager at CBP, Christine Flanigan, was transferred out of CBP at the Phillies' request,  the work

---

[9] Defendant argues that the male employees who received different treatment from Ms. Gates were not similarly situated employees, and therefore not valid comparators. For instance, Mr. Coleman and Mr. McCready were her subordinates, and Mr. Hastings and Mr. Tedesco were her superiors. *See Mandel v. M & Q Packaging Corp*, 706 F.3d 157, 170 (3d Cir. 2013). Def's Mot. Summ. Judg. at 7-8. But comparators are not necessary in every case, *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999) (comparator evidence "is not an essential element of a plaintiff's case") and this evidence remains relevant in they were members of her team who had related responsibilities.

environment had a "boy's club" atmosphere, and, following her termination, Ms. Gates' was replaced by a man. *See Lazard v. All Restore,* LLC, No. 19-6040, 2021 WL 1175137, at *7 (E.D. Pa. March 29, 2021) (*citing Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2017) (citation omitted) (non precedential) (reasoning that the fact a plaintiff was replaced by an individual who is not a member of a protected class is sufficient to establish an inference of discrimination).). This constitutes sufficient evidence from which a reasonable factfinder could find a prima facie case of discrimination on the basis of sex.

    b. *Legitimate Non-Discriminatory Reason and Pretext*

Defendants satisfy their burden of coming forth with a legitimate nondiscriminatory reason for Plaintiff's termination. Aramark contends that it terminated Ms. Gates' employment because "Aramark managers observed multiple issues with her job performance, such as the timeliness of her financial reporting, inaccuracies in her calculations and reports, and her inability to adequately address questions from executives from Aramark and the Phillies, that did not improve even after Aramark assigned someone to help her and worked with her on the PIP." Def's Mot. Summ. Judg. at 9. Defendant has therefore met the "relatively light burden," of establishing a non-discriminatory reason for Ms. Gates' termination.

The burden then "shifts back to the employee, who "must show that the employer's reason was a pretext for intentional discrimination." *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 364 (3d Cir. 2008). To do this, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.

Defendants argue that "Ms. Gates cannot meet her burden of demonstrating pretext because she relies solely on her unsupported belief that Mr. Carson of the Phillies pressured Aramark into terminating her employment." Def's Mot. Summ. Judg. at 9. Aramark also notes that Carson left the Phillies before Aramark managers made the decision to terminate Ms. Gates' employment, and Defendant, without any input from the Phillies, made the decision to terminate Ms. Gates based on her performance errors. *Id.*

Nonetheless, I conclude that Plaintiff offers evidence from which a reasonable jury could find that Aramark terminated Ms. Gates because of her sex. According to Ms. Gates, when Mr. Hastings placed her on a PIP, he explained that "the Phillies are very unhappy with [her] and things have escalated quickly, and they needed to do something" and "maybe they don't like women" Gates Dep. 119:13-18, 239:23-240:3. Mr. Hastings' denial of making these comments creates a genuine dispute of material fact as to whether the Phillies contributed to Ms. Gates' placement on the PIP, and if so, whether this was as a result of discrimination or because of legitimate concerns about her poor performance. Plaintiff bolsters her argument by pointing to the fact that, although Defendant employees testified that Ms. Gates performed deficiently, they provided very little in the way of documentation outlining her deficiencies prior to the issuance of the PIP. Her argument is further strengthened by the fact that Mr. Hastings informed the Phillies that Aramark had placed Ms. Gates on a PIP, which was generally confidential information that Aramark would not share with their clients. Hastings 100:2-20, 102:102:4-21. Defendant may well be correct that placement on the PIP does not constitute an adverse employment action absent accompanying

changes to pay, benefits, or employment status.[10]   Nonetheless, the circumstances surrounding the Defendant's decision to place Ms. Gates on a PIP may shed light on whether her overall treatment, including her ultimate termination, was a product of discrimination.

Defendants attach great significance to the fact that Mr. Carson had left the Phillies before Ms. Gates was fired, but it remains obvious that the contract with the Phillies was an important one that impacted Aramark's personnel decisions. This is supported by the facts that 1) Aramark acceded to the Phillies' request that Mr. Coleman work with Ms. Gates; and 2) Aramark acceded to the Phillies' request that another female employee be laterally transferred from CBP to another position.  In particular, the circumstances of Ms. Flanigan's transfer support Plaintiff's interference of sex discrimination.   Defendant's proffered explanation for transferring Ms. Flanigan may unwittingly reflect negative stereotypes about women executives.  Mr. Hastings testified that she was transferred because Mike Stiles, then the Phillies' Vice President of Operations, and Phillies' marketing employees were "unhappy with her communication, her management style, you know, she could be kind of gruff and lacked a filter in meetings...And while she was a very good operator, they were looking for somebody as the General Manager for Citizens Bank Park just to carry themselves on a higher level than you know, she was perceived as doing." Hastings Dep. 56:24-57:15. When Mr. Hastings communicated with Ms. Flanigan about her transfer, "[i]t was very difficult...[because] [o]perationally, you know, she was, you know, doing a very good job." *Id.* 57:16-24.   Vague language criticizing a woman for being "gruff" or assertive, where she is

---

[10] Aramark relies on a non-precedential decision, *Reynolds v. Dep't of* Army, 439 F. App'x 150, 153-54 (3d Cir. 2011).  As I have previously observed, district judges who rely on them do so at their peril.  *See Allegheny County Employees' Retirement System et al. v. Energy Transfer*, 532 F. Supp. 3d 169, 236 (E.D. Pa 2021) (any purported guidance from non-precedential cases is illusory); *United States v. James*, 928 F.3d 247, 254 n.5 (3d Cir. 2019) (disregarding the district court's discussion of two non-precedential cases because of their lack of authority); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 212 n.1 (3d Cir. 2015) (sympathizing with district judge who "understandably relied" on three non-precedential opinions before reversing him, noting the their non-binding status).

otherwise successfully performing her job, is sufficient such that a reasonable jury could find the Defendant's actions to be motivated by sexist stereotyping. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (superseded by statute on other grounds). "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." Moreover, at the time of Ms. Gates' firing, Ms. Gates and Ms. Flanigan were the only two high-level women ever to work for Defendants on the Phillies account at CBP, Hastings Dep. 203:11-18, and according to Mr. Hastings, they were also the only two high-level employees with whom the Phillies were unhappy.  Hastings Dep. 203:11-18, 61:5-16, 55:23-56:9.

In addition, while Aramark attempts to distance itself from Mr. Carson, Plaintiff has alleged facts suggesting that the wider Aramark employee culture at CBP was discriminatory.  For example, the record contains testimony regarding sexist remarks made by Aramark employees, it was Aramark employees who stared at Ms. Gates' breasts, and it was the *Aramark* area of the Phillies that was designated by a sign as "The Frat House."  Plaintiff testified that she felt excluded by fellow Aramark employees and that the culture was that of a boy's club.  And Aramark made the decision to replace Plaintiff with an individual outside of her protected class.

Another issue of material fact is whether the mistakes that Aramark cites as the reason for Ms. Gates' termination were solely her responsibility.  Defendant alleges that Plaintiff had the ultimate responsibility for ensuring the timeliness and accurateness of information.  Dunn Dep. 59:8-10; Hastings Dep. 83:5-9; 113:16-19.  Plaintiff points to the fact that she worked with a team, and in addition to herself, reports had to be checked by Mr. Tedesco and Mr. McCready, yet any mistakes were solely attributed to her. Gates Dep. 18:5-24, Dunn Dep. 57:12-24; 58:8-12 (acknowledging

that by the time numbers reach his level, they should have been reviewed by General Managers and District Managers, such as Mr. Tedesco and Mr. Hastings, whose performance was not criticized). As to Defendant's specific example of concerns with a report regarding CBP commissions, Ms. Gates testified that she double checked the numbers "together with Kirk and Kevin...we all had reviewed the information, looked at it together, before, you know, I sent it off." Gates Dep. 181:8-24.

Viewing the facts in the light most favorable to the Plaintiff and recognizing her 27-year employment with Defendant in which there were no documented concerns with her work, there are  genuine issues of material fact as  to  whether discriminatory animus  motivated  Defendants' actions. A reasonable  fact finder  could  find  that  the  circumstantial  evidence,  combined  with Plaintiff's testimony, contradicts Defendant's account and shows the true reason for the dismissal was impermissible discrimination.  As a result, summary judgment is not warranted.

Because the standard for PHRA claims and PFPO claims mirror the standard under Title VII, those  claims  may  also  proceed.  *See  e.g. Dici  v.  Commw.  Pa.*,  91  F.3d  542,  552  (3d Cir.1996) (the PHRA is applied in a similar manner as Title VII); *see also Joseph  v.  Cont'l Airlines,  Inc.*,  126  F.Supp.2d 373,  376  n.  3  (E.D.Pa.2000) (analysis of a claim under Title VII applies in equal force to the PFPO).

**2.  Summary Judgment is Granted as to Ms. Gates' Hostile Work Environment Claim**

Plaintiff also asserts that she was subjected to a hostile work environment. To prevail on a hostile work environment theory of sex discrimination, a plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the discrimination; (4) the detrimental effect was objectively

reasonable; and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packing Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Group*, 863 F.3d 259, 264 (2017).

There is no need to address Defendant's argument that Ms. Gates failed to exhaust, as this claim fails on the merits. The standard for a hostile work environment claim is "demanding." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998). Such claims are reserved for situations "when the workplace is permeated with discrimination, intimidation, ridicule and insult that is sufficiently severe or persuasive so as to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 78.  *See also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214-15 (3d Cir. 2017).

Ms. Gates can point to evidence that she worked in a male-dominated environment where coworkers and supervisors may have harbored certain biases toward women.  As noted above, such evidence is properly considered in evaluating Aramark's decision to terminate her.  That same evidence suffices to explain why she felt uncomfortable in some instances in her workplace.  It does not suffice to establish that her workplace was hostile.  She was not subjected to unwanted physical touching were sexually suggestive comments.  And while she understandably objected to being ogled by male coworkers, she points to only a few such instances over a substantial period of time.  The seemingly sexist remarks she sometimes overheard were not directed at her.  And nothing in her exchanges with the Phillies' Carson made specific reference to her gender.  The designation of the Aramark work area as the "Frat House" certainly seems to reflect the embrace of an immature world view by some of its employees, and perhaps an exclusionary culture toward women at Aramark.  Nonetheless, the legal standard for a hostile work environment is notably high and requires such severe or pervasive behavior as to function as an abusive work environment, which is not met here.   Plaintiff's complaint with respect to the hostile work environment claim

focuses primarily on Plaintiff's allegation that the Phillies "unjustly criticized [her] performance and treated [her] in a more hostile and dismissive manner than the Phillies treated Defendant's male employees," she communicated to Aramark about feeling unjustly criticized, and Mr. Hastings believed that "maybe" Mr. Carson does not like women. Compl. ¶¶24,26-32.   When pressed to describe how the workplace was hostile at deposition, Plaintiff essentially recounted the same facts that support her discrimination claim: "It goes back to all the interaction, the PIP, being—different conversations, being told that the Phillies were not happy, Mike wasn't happy, you know, being told that—being told that maybe it is because you are a woman, maybe they don't like women. I was beaten down. My confidence was beaten down."  Gates. Dep. 302:2-13.

In the final analysis, although Ms. Gates may have found her time assigned to the Phillies to be extraordinarily unpleasant, I cannot conclude that it is sufficient to meet the demanding standard for a hostile work environment claim under Title VII.   Ms. Gates' hostile work environment claims also fail under the PHRA and the PFPO because, as discussed above, claims under the PHRA and PFPO are reviewed co-extensively with Title VII.  *See McDonell Douglas Corp.*, 411 U.S. at 802-03; *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted); *Vandergrift v. City of Phila.,* 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017) (quoting *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 567 (3d. Cir. 2002)).

### 3.  Summary Judgment is Granted with Respect to Ms. Gates' Retaliation Claim

Plaintiff also asserts that her termination was in retaliation for her complaints to Mr. Hastings about sex discrimination. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment...because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took adverse action against her and (3) there is a causal link between the protected activity and the adverse action. *Charlton v. Paramus Bd. Of Ed.*, 25 F.3d 194, 201 (3d Cir. 1994). "If the employee establishes this prima facie case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Philadelphia,* 461 F.3d 331, 342 (3d Cir. 2006) (cleaned up).

Verbal complaints to management are sufficient to constitute protected activity. *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) (stating that complaints to employer, "whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case"). And opposition to unlawful discrimination need not be significant or formal. Rather, the Third Circuit has directed courts to focus on the "message being conveyed rather than the means of conveyance." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.,* 450 F.3d 130, 135 (3d Cir. 2006); *see also Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277 (2009) (observing that the term "opposition" may be used in reference to "someone who has taken no action at all to advance a position beyond disclosing it"). "A plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture*, 85 F.3d 1074, 1085 (3d Cir. 1989) (cleaned up).

Ms. Gates alleges that she engaged in protected activity when she reported to her supervisor, Mr. Hastings, around May 30, 2017, that she was concerned she was being discriminated against by the Phillies because she was a woman.  Compl. ¶¶31-32.  In addition, in an earlier conversation around May 17, 2017, Plaintiff complained to Mr. Hastings that "her actions with the Phillies were humiliating and demoralizing, and that no matter what she did she was criticized."[11] *Id.* ¶¶28-29. When asked during her deposition, "[b]y terminating your employment, what do you believe they were retaliating against you for doing?" Ms. Gates responds, "[f]or upsetting the Phillies, upsetting the apple cart, possibly putting the contract in jeopardy of being renewed." Gates Dep. 279:19-280:1.

Taking as true Plaintiff's allegation that she complained about sex discrimination to Mr. Hastings, which constitutes protected activity, the issue is whether her termination can be linked to the protected activity. A plaintiff may rely on a range of evidence to demonstrate the causal link between the protected activity and the adverse action, including by showing temporal proximity that is "unusually suggestive of a retaliatory motive." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).

A significant gap between the protected activity and the adverse action does not rule out the possibility of proving retaliation, because "it is causation, not temporal proximity itself that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which to prove an element of causation." *Kachmar v. SunGaurd Data Systems Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).  That said, a gap of months between protected activity and the adverse action weighs against a finding of retaliation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

---

[11] During her deposition, Ms. Gates does not expressly state that she expressed her concern that she was being discriminated against to Mr. Hastings. She alleges that at the first meeting, in response to Mr. Hasting's comment that "maybe he [Carson] doesn't like women" she responded, "I don't know, I would hope that's not the case." Gates Dep 235:16-22.

268, 273-74 (2001).  Here, the lapse of time is significant, as approximately five months passed between when Ms. Gates spoke with Mr. Hastings during May 2017 and her termination on October 19, 2017.

Critically, there is nothing else in the record from which a reasonable jury could find that she was retaliated against for engaging in protected activity.  Plaintiff has provided no evidence to indicate that Aramark considered the concerns discussed by Ms. Gates and Mr. Hastings in May 2017, when deciding to terminate her employment months later. And speculation alone is insufficient to sustain a retaliation claim because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).  Furthermore, according to Plaintiff's version of events, Mr. Hastings, who was responsible for the decision to fire her, admitted to Plaintiff that the Phillies may be biased towards women and seemed receptive to Ms. Gates, which cuts against a finding that Mr. Hastings would have retaliated against her for raising the same concern that he did.

For these reasons, Defendant's motion for summary judgment is granted with respect to Ms. Gates' retaliation claim.

For the same reasons discussed above, Ms. Gates' claims regarding retaliation fail under the PHRA and the PFPO.

### 4.  A Jury Must Decide Whether Any Economic Damages Should be Limited.

The parties debate whether any economic damages Ms. Gates may be awarded should be limited based on her duty to mitigate her lost earnings.  Mitigation is an affirmative defense, for which the breaching party bears the burden of proof.  To prove a failure to mitigate, one must

show: "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced." *Prusky v. ReliaStar Life Ins. Co*., 532 F.3d 252 (3d Cir. 2008) (citations omitted). Damages that could have been "avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered ... as not being chargeable against the defendant." Reasonableness "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." *Id.*

Whether a plaintiff has met the duty to mitigate damages is a question of fact, and therefore properly reserved for the jury where there is a genuine dispute of material over plaintiff's mitigation efforts. *See Booker v. Taylor Milk Co.*, 64 F.3d 860, 864-65 (3d Cir. 1995).   The parties' disagreement must be left to the jury.

**5.  Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be denied as to Plaintiff's sex discrimination claim and granted as to Plaintiff's hostile work environment and retaliation claims.  An appropriate order follows.

 /s/ Gerald Austin McHugh   
United States District Judge